Ernest LEWIS, Libelant,

v.

MARITIME OVERSEAS CORPORA-
TION, a foreign corporation,
et al., Respondents.

No. 9221.

United States District Court
D. Oregon.

May 6, 1958.

454

Philip J. Poth, Zabel & Poth, Seattle, Wash., Paul D. Hanlon, Freed, Campbell & Hanlon, Portland, Or., for libelant.

Erskine Wood, Wood, Matthiessen, Wood & Tatum, Portland, Or., Charles B. Howard, Summers, Bucey & Howard, Seattle, Wash., for respondents.

EAST, District Judge.

This is a suit *in personam* in admiralty arising out of a claim for personal injuries suffered by the libelant, a longshoreman. This Court has jurisdiction over the respondents Maritime Overseas Corporation and Ocean Transportation Co., Inc., by virtue of a foreign attachment in admiralty, levied against the vessel Ocean Evelyn within this District, and a security and general appearance

stipulation filed by the respondents to secure her release. Admiralty Rules 2, 5, 28 U.S.C.A.; Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A., 1950, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206. The respondents subsequently answered the libel.[1]

Respondent Maritime Overseas Corporation was the operator of the steamship Ocean Deborah for the owner Ocean Transportation Co., Inc.; the latter was the employer of the crew of the vessel. In May of 1957 libelant was injured while engaged in the pursuit of longshoring as a winch driver employed by an independent contractor, Rothschild International Stevedoring Company, aboard the steamship Ocean Deborah, the vessel then being afloat on the navigable waters of the Port of Seattle, Washington.

Prior to the commencement of this suit, the libelant filed his notice of election to sue a third party with the Commissioner administering the Longshoremen's and Harbor Workers' Compensation Act for his District. 33 U.S.C.A. § 933.

### Facts

At 7:00 o'clock on the evening of May 29, 1957, libelant commenced work as a winch driver at No. 4 hatch aboard the Ocean Deborah. The ship was lying port side to the pier preparatory to receiving heavy cargo; libelant was standing at the winch controls which were located upon the weather deck immediately aft of No. 4 Hatch at the midline of the ship. Immediately upon boarding the ship, libelant and his fellow longshoremen engaged upon rigging the ship for heavy lifts. Because of the type of cargo to be loaded, the ship's booms were not to be used, but instead the lifts were to be handled by a dockside, trackmounted, roving crane referred to as a "jumbo". In order to provide sufficient clearance for the operation of the jumbo, it was necessary to remove the ship's radio antenna, which was strung between No. 3 mast and No. 4 mast along the centerline of the ship and at some considerable height above the weather deck. The after end of the antenna was attached to No. 4 mast, which was located immediately after the opening of No. 4 hatch, by means of a heavy insulator. The antenna proper was of ⅓ or ⅜ inch cable approximately 180 feet in length, and testimony tended to establish the weight of the insulator at about 10 pounds. As above mentioned, the after end of the antenna proper was attached to an insulator and the after end of the insulator was attached to a smaller wire cable which ran through some type of aperture on the mast and thence down to a cleat located upon the resistor house at the base of No. 4 mast. The insulator, although usually located next to No. 4 mast at the point of support, was in fact only a link in the line between the antenna proper and the "ginney line" (sic).[2]

Upon commencing work that evening, the stevedore foreman informed one of the ship's mates that it would be necessary for the ship's crew to remove the antenna. The foreman did not notify the libelant or the members of his gang that the antenna was to be removed, but it appeared from the testimony that the libelant knew that the antenna would have to be removed eventually. At about 7:45 P.M., while libelant was engaged in operating the winch controls, the Chief

---

1. "The suit at bar remains an action *in personam* despite the fact that property has been seized. The action is not changed into a proceeding *in rem* because of the attachment. In re Louisville Underwriters, 134 U.S. 488, 490, 10 S.Ct. 587, 33 L.Ed. 991. * * *" Asiatic Petroleum Corp. v. Italia Societa Anonima Di Navigazione, 3 Cir., 1941, 119 F.2d 610, 611, 613.

The instant libel was also *in rem* against the steamship Ocean Deborah, but her arrest was not perfected within this District, hence the libel *in rem* must fall. Admiralty Rule 10. But see Warren v. United States, 2 Cir., 1949, 179 F.2d 919.

2. Webster's New International Dictionary: "gantline, Naut., a line rove through a block, as at a bowsprit end for hoisting rigging, hanging clothing, etc."

Mate, or at least an officer of the ship generally thought by the stevedore foreman and others to be the Chief Mate, climbed atop the resistor house, removed the "ginney line" (sic) from the cleat and began to lower the antenna. While so engaged the Chief Mate lost control of the line and the antenna fell upon libelant, the insulator striking him at the base of the skull and in the cervical area of the spine. No warning was given by the Mate to the libelant regarding the lowering of the antenna, and it is established that the entire operation took place directly above the place occupied by the libelant. Libelant had no independent knowledge that the antenna was being lowered above him, or even that the Mate was in the vicinity of the resistor house.

## Law

■ At one time, as to a seaman, the actions for unseaworthiness and negligence as against the owners or the ship were separate and distinct entities, unseaworthiness of the ship being a failure to supply and keep in order the proper appliances appurtenant to the ship, and negligence being lack of due care with respect to the navigation and management of the vessel. The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760.[3] This distinction was kept intact in Plamals v. The Pinar Del Rio, 1928, 277 U.S. 151, 48 S.Ct. 457, 72 L.Ed. 827, wherein a seaman was unable to come within Sec. 33 of the Jones Act, 41 Stat. 1007, 46 U.S.C.A. § 688. However, the value of this distinction became greatly depreciated following the decision in Mahnich v. Southern Steamship Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, wherein a seaman brought suit under general admiralty law for unseaworthiness, his Jones Act count having been barred by the time limitation therein. The injuries resulted from a fall from a staging which had been rigged with defective rope, such rope having been selected by the ship's boatswain in a negligent manner while sound rope was available. The court said, 321 U.S. at page 100, 64 S.Ct. at page 458:

"If the owner is liable for furnishing an unseaworthy appliance, even when he is not negligent, *a fortiori* his obligation is unaffected by the fact that the negligence of the officers of the vessel contributed to its unseaworthiness."

■ That a shipowner is liable to a *longshoreman*, at least while aboard ship, as well as to a member of the crew, for injuries caused by unseaworthiness of the vessel, and that the obligation of the owner is nondelegable and is not relieved by the exercise of due diligence of the owner, has been firmly established. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Petterson v. Alaska S.S. Co., Inc., 9 Cir., 1953, 205 F.2d 478, affirmed 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, rehearing denied 1954, 347 U.S. 994, 74 S.Ct. 848, 98 L.Ed. 1127; Lahde v. Soc. Armadore Del Norte, 9 Cir., 1955, 220 F.2d 357 (in rem); cf. Pope & Talbot, Inc., v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (carpenter); Yanow v. Weyerhaeuser Steamship Co., 9 Cir., 1958, 250 F.2d 74.

■ There is little doubt but that a *longshoreman*, as well as a seaman, may recover under an unseaworthiness count regardless of whether or not the unseaworthy condition is brought about by an inherent structural flaw or by negligence of the master or crew in selection or repair and maintenance of appliances or

---

3. Indeed, the importance of this distinction is emphasized by the decision in that case, which although recognizing that a seaman could recover for injuries caused by unseaworthiness of the ship, held that a seaman could not recover for injuries caused by the negligence of the master or any member of the crew. That even before this time, unseaworthiness and negligence had been commingled is made apparent by the reference to the opinion in The A. Heaton, C.C., 43 F. 592, delivered by Mr. Justice Gray, found in The Osceola, 189 U.S. at page 174, 23 S. Ct. at page 486.

general management of the ship. Seas Shipping Co. v. Sieracki, *supra*.[4]

It has also been settled that a longshoreman may recover both *in personam* against the owner and *in rem* for personal injuries caused by that type of "operational" negligence aboard ship which does not render the ship unseaworthy. Pope & Talbot, Inc., v. Hawn, *supra* (*in personam*); Lahde v. Soc. Armandora Del Norte, *supra* (*in rem*, dictum includes *in personam*); Johnson Line v. Maloney, 9 Cir., 1957, 243 F.2d 293 (*in personam*); Imperial Oil v. Drlik, 6 Cir., 1956, 234 F.2d 4 (*in personam*); cf. Palazzolo v. Pan-Atlantic S.S. Corp., 2 Cir., 1954, 211 F.2d 277, affirmed Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133.

The instant libel contains a count for unseaworthiness and a count for negligence; this is permissible and, indeed, the accepted mode of pleading in this type of case; usually it makes little difference upon which recovery is granted, since unseaworthiness has virtually swallowed up negligence.[5]

The upshot of this situation has been a good deal of loose talk commingling negligence and unseaworthiness by counsel, and, in some court opinions, mixed in with scrambled jury instructions. See dissent Pope & Talbot v. Hawn, *supra*. Conceding that it generally makes little difference, except to the theorist, whether or not the two causes of suit are kept isolated, the instant case is not one of those.

It is readily apparent from the evidence that no unseaworthiness has been shown. The offending antenna aboard the Ocean Deborah did not part, nor is it shown that it was in any manner defective either as to its inherent construction or rigging; its fall was caused solely by the affirmative act of the Mate who lost control of the "ginney line" (sic) as he was in the process of lowering the after end of the antenna. In other words, the libelant's injuries were the result of the affirmative conduct of the ship's Mate in handling a perfectly sound appurtenance of the ship.

Our inquiry is then focused upon this conduct in order to determine if it be negligent or not, so as to visit liability upon the shipowner, the employer of the Mate. Without deciding whether or not the stevedore company was under a duty to warn libelant as to the proposed removal of the antenna, certainly the Mate, a member of the ship's crew who was actually the person engaged in removing the after end of the antenna, was under such a duty to warn. This duty to warn libelant of the potentially dangerous, indeed hazardous activity being engaged in directly above his working station by members of the ship's company, arises out of the nondelegable obligation which the shipowner or ship owes to provide the libelant, as a business visitor or invitee, a reasonably safe place in which to work. Johnson Line v. Maloney, supra. The Mate being under a duty to use due care in lowering the antenna, such due care also encompassing the giving of a warning to libelant so as to enable him to stand clear; no warning was given and the mate let go the "ginney line" (sic), thus his conduct in lowering the antenna was negligent as to the

---

4. "For these purposes he (stevedore, i.e., longshoreman) is, in short, a seaman because he is doing a seaman's work and incurring a seaman's hazards." (Parentheses supplied.) Note at page 99 of 328 U.S., at page 880 of 66 S.Ct.

5. Gilmore and Black, The Law of Admiralty, p. 364:
"Thus, according to Hawn, harbor workers now have, in addition to the compensation remedy, both the right to recover as seamen for unseaworthiness and the right to recover as business invitees for negligence which does not happen to constitute unseaworthiness. Since unseaworthiness has virtually swallowed up negligence, it is hard to imagine a plaintiff so situated that he will need the extra privilege granted by Hawn. Nevertheless, as Hawn's case shows, counsel will continue to talk about negligence even when there is no need to."

libelant,[6] and the respondents are liable for resulting injuries to libelant.

## Contributory Negligence

 The defense relies upon contributory negligence. The evidence sustains no such contention, it has not been shown that libelant either knew or should have known of the particular activities of the crew being carried on above and behind him at the time immediately prior to his injury. Libelant's duties as a winch driver required his full and complete attention, and he is under no duty to keep constantly appraised of the activities of the various members of the ship's crew.

## Damages

The evidence sustains and this Court so finds that the following injuries were suffered by libelant as a proximate result of the negligence of the respondents.

Immediately upon being struck by the antenna and insulator, libelant was knocked to the deck and rendered substantially unconscious. He sustained a moderate cerebral concussion followed by intermittent severe headaches and impaired vision; however, his visual impairment had apparently righted itself by the time of trial, and no other permanent effects are present as the result of the concussion.

Immediately upon entry to the hospital, the evening of the injury, libelant was in a state of shock, suffered extreme pain in both the cervical and lumbar regions of the spine, and had an open and bleeding abrasion near the area of the seventh cervical vertebra. Libelant was under treatment in the hospital in Seattle, Washington, for nearly one month, having been released for one day during that period; he was in traction for approximately three weeks of this time for the relief of his spinal injuries. An indwelling catheter was in place for the first four or five days of his hospitalization.

There exists acute muscle spasm of the involuntary muscles of the neck, resulting from a severe strain and sprain of the neck and a severe tearing and wrenching of the ligaments, nerves, and soft tissues in and around the cervical area, especially the area of the sixth cervical vertebra, causing a substantial limitation of motion in the neck. Libelant has suffered acute pain associated with this injury from date of injury to date of trial, which pain will continue indefinitely with some permanent residual impairment. Because of nerve damage, libelant has suffered tingling and distress in the fourth and fifth fingers of the left hand. Also there is nerve involvement in and around the nerve roots located in and around the area of the fourth and fifth lumbar vertebrae, causing pain radiation down the right leg. There is no permanency in this lumbar injury. However, recovery will not be complete for a period of years.

Libelant has been under constant heat and massage treatment from the date of his release from the hospital to the date of trial, a period of six months. He has been required to wear a neck brace a substantial portion of that time and has undergone sporadic physio-therapy which could not be continued because of severe pain.

 Libelant has been totally disabled for nine months at time of trial and will continue to be so disabled for an indefinite period of time, reaching his maximum cure within two to three years from the date of the accident. There will be moderate partial permanent disability, which will necessitate his pursuing some vocation less strenuous than his former longshoring pursuits. Libelant's earn-

---

6. As to why the Mate lost control of the line, from testimony of the stevedore foreman who talked to the Mate immediately after the happening of the injury:

"I went right to Ernie, and took a look at him, and it was just seconds and the Chief Mate came up, and I said to the Chief Mate, 'What happened?' He said, 'Jiminy, I don't know. I just let go of the darn thing.' He says, 'I can't explain it. It is just one of those things. I know it is my fault.' And he says, 'That is just it.' "

ings have averaged in excess of $6,000 annually for the preceding six years. This Court finds that libelant is entitled to recover damages as follows:

| | | |
|---|---|---|
| Hospitalization | $ | 665.35 |
| Medical bills to date | | 1,152.00 |
| Loss of earnings until time of trial | | 4,000.00 |
| General damages for pain and suffering and loss of earning power | | 28,000.00 |
| Total | | $33,817.35 |

Johnson Line v. Maloney, 9 Cir., 1957, 243 F.2d 293; Farley v. United States, 9 Cir., 1958, 252 F.2d 85; Imperial Oil v. Drlik, 6 Cir., 1956, 234 F.2d 4; Perin v. Southern Pacific Co., District of Oregon, Civil No. 9355 (jury verdict of $20,000 returned), March 6, 1958; Moe v. Alsop, 189 Or. 59, 216 P.2d 686.

Proctor for libelant will submit pro-posed findings, conclusions and decree in conformity with this opinion.