Ishmal Ray SMITH, Libellant,

v.

John E. SEITTER, Respondent.

No. 282.

United States District Court
E. D. North Carolina,
New Bern Division.

Jan. 3, 1964.

Claud R. Wheatly, Jr., Beaufort, N. C., for libellant.

George H. McNeill, Morehead City, N. C., for respondent.

LARKINS, District Judge.

## SUMMARY

The libel in this admiralty case combines three actions within the Jones Act, 46 U.S.C. § 688, for damages, maintenance, and cure. The cause came on to be heard at a Special Term at Beaufort, North Carolina, commencing July 29, 1963, before this Court sitting without a jury.

The libel is based upon a personal injury sustained by a seaman on the shrimp trawler, SHELLFISH, owned by Respondent Seitter. The accident occurred on October 27, 1962 while the SHELLFISH was trawling off the coast of South Carolina, near McClellanville. Proctors for the litigants have stipulated that Respondent is the owner of the SHELLFISH and that Libellant was a member of the crew and was acting in that capacity at the time the injury occurred.

The evidence supports the following

## FINDINGS OF FACTS

(1) Libellant, Ishmal Ray Smith, is a forty-three year old man with a seventh grade education. He has worked principally as a fisherman in some capacity for his entire adult life.

(2) In the late summer of 1962, Libellant conferred with Captain Dennis O'Neal and John Seitter about employment on the double-rig shrimp trawler, SHELLFISH, owned by Seitter. Smith accepted employment in the presence of Seitter and O'Neal, at which time an understanding existed among the three that they would work the vessel together in North Carolina waters and later move south and work off the coast of South Carolina. The group agreed that O'Neal was to operate the vessel, Seitter was to run the winch, and Smith was to serve as a deck hand. These three men composed the operating crew of the SHELLFISH. Seitter, as owner of the SHELLFISH, was to receive one-half the catch, after which Seitter, O'Neal and Smith, as crewmen, were to share the remaining one-half by receiving one-third each.

(3) The vessel SHELLFISH is a government built craft converted into a trawler. At the time of the accident, she was equipped with a double rig for shrimping, that is, she could drag two shrimp trawls, or nets, at the same time. One trawl is dragged from the starboard side and the other from the port side. Each trawl is connected to the vessel by a single steel wire cable which runs from the trawl to a dragarm which extends from each side of the boat. The cable runs from the trawl up through a block attached to the corresponding dragarm down through a block on the deck waist, hence to a drum of the double winch. The drums sit fore and aft, with the forward drum taking in the cable from the port side and the after drum receiving the cable from the starboard side. The drums are equipped individually with a brake pedal operated by foot and a manual-operated clutch handle, which, when pulled towards the operator, places the winch in gear to start the drum revolving. The position

of the winch is just ahead of the pilot house on the port side. The SHELLFISH was without an automatic pilot.

(4) Prior to October 27, 1962, these three crewmen worked together on the SHELLFISH for approximately two weeks in North Carolina waters and then moved to South Carolina where they worked for about three weeks. At this time the vessel was taken out of commission for a week and a half for engine repair. A day or so after resumption of trawling, Seitter left the vessel to return to Morehead City. Before his exit, however, he gave Smith some experience operating the "Hancock-made" winch with which Smith was unfamiliar. Several days before the accident Smith nailed a wooden block to the deck in order to raise his feet high enough to properly operate the brake pedals of the winch.

(5) On October 27, 1962, O'Neal and Smith were operating the SHELLFISH in Bull's Bay near McClellanville, South Carolina, following Seitter's departure. Both trawls were dragging. At approximately 9:00 a. m., Captain O'Neal ordered Smith to take up the try-net to get a sample of what they were catching. The net was brought up and emptied fore of the pilot house in the area of the winch. O'Neal and Smith picked the shrimp out and O'Neal attempted to rake the remaining "trash" sea life from the deck down the scupper holes. During this time the vessel was without a pilot and the engines were in gear.

(6) O'Neal entered the pilot house and gave the order to take up the trawls. Smith started the winch and began to take up. Neither man had hosed down the deck after dumping the try-net, although that was one of Smith's duties as deck hand. O'Neal swung the SHELLFISH around. At this time Smith was standing on the wooden block with his toes on the brake pedals. He was spooling, or fleeting, the cable as it reeled in on the forward drum. This he did in spite of repeated warnings from O'Neal and Seitter on past occa-

sions concerning the danger involved in this practice. As the vessel swung around and pitched, Smith lost his balance and slipped from the brake pedals and wooden block. He lurched forward and the winding bridle section of the cable caught his extended right hand in the winch, pulling him down until his head touched the drum. The double cable, or bridle, crossed all four fingers of the right hand leaving a deep laceration.

(7) Smith wore cotton gloves and rubber boots. He yelled in excruciating pain and O'Neal immediately cut the engines and began to extricate Smith from the winch. Smith laid on the deck while O'Neal struggled to get the rigs up. They then proceeded in to McClellanville and from there to Charleston where Libellant was admitted to the Public Health Service Clinic of Roper Hospital under seaman papers signed by Captain O'Neal. An intern took Smith to the emergency room where he observed the hand and attempted to work the fingers into place. Smith was x-rayed after which the little finger was sewed and the forefinger was pulled in an effort to locate it in its normal position. A cast was placed over the injured hand and another x-ray was made. A nurse gave Smith three pills for relief of pain and he was released.

(8) Two days later Libellant visited Dr. Jerry Norris, the marine doctor at Morehead City, North Carolina, upon advice of the doctor at Roper Hospital. He was informed by the nurse that his seaman papers were filled out improperly, so he returned the following week. At this time Dr. Norris told Smith to return in six weeks, but Smith waited twelve weeks before he came back. On this third visit the cast was removed and the hand x-rayed. Upon discovering that Libellant's right index finger would not flex, Dr. Norris referred Smith to the U. S. Public Health Service Hospital in Norfolk, Virginia, under a standard admission form; however, he was unable to receive treatment since the hospital was filled to capacity and Dr. Norris had

failed to arrange for Smith to gain admittance. Smith returned home and sought no further medical attention.

(9) The only financial assistance received by Libellant from Respondent has been twenty dollars to defray the expenses of the Norfolk trip.

(10) Dr. Preston B. Spigner, Jr., an Orthopedic Surgeon, testified that he clinically examined the Libellant's right hand and made x-rays several days before the trial of this case. He found that the original fracture of the right index finger had not been reduced, that the bone was displaced, and that the finger, for the most part, was void of sensation. The numbness and stiffness of the index finger limits the execution of motion of the other three fingers. Dr. Spigner's opinion was that the hand was seventy-five percent disabled; and, he recommended amputation of the index finger to facilitate greater use of the remaining fingers.

## CONCLUSIONS OF LAW

■ In Lewis v. Maritime Overseas Corporation, D.C., 163 F.Supp. 453 (1958), Judge East stated that:

"At one time, as to a seaman, the actions for unseaworthiness and negligence as against the owners or the ship were separate and distinct entities, unseaworthiness of the ship being a failure to supply and keep in order the proper appliances appurtenant to the ship, and negligence being lack of due care with respect to the navigation and management of the vessel. The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760. * * * However, the value of this distinction became greatly depreciated following the decision in Mahnich v. Southern Steamship Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, * * *."

Under the Jones Act, 46 U.S.C. § 688, an injured seaman may assert a claim against a shipowner on the ground that the latter was negligent and join therewith a claim based on the unseaworthiness of the vessel and the tort claim is in addition to and independent of the seaman's right to maintenance and cure. Reardon v. California Tanker Company, 260 F.2d 369 (2nd Cir., 1958), certiorari denied 359 U.S. 926, 79 S.Ct. 609, 3 L.Ed.2d 628 (1959).

"* * * [T]his is permissible and, indeed, the accepted mode of pleading in this type of case; usually it makes little difference upon which recovery is granted, since unseaworthiness has virtually swallowed up negligence." Lewis v. Maritime Overseas Corporation, supra.

■ As the libel reads in this instant case, it is based upon three actions: damages under the Jones Act, maintenance, and cure. However, the evidence at the trial raised the issue of seaworthiness and proctor for the Libellant stated that the issue was before the court and the court so recognized. (See pages 261 and 263, Volume II of the record). All of this was done without objection from proctor for the Respondent, in fact, he impliedly consented to having the issue before the court since he offered and elicited testimony negating the insufficiency of a two-man crew. In no way was Respondent caught unaware. He was under no disadvantage by the introduction of a new issue. Therefore, there was an implied amendment to the libel within the meaning of Rule 15(b) of the Federal Rules of Civil Procedure. June T., Inc. v. King, 290 F.2d 404 (5th Cir., 1961).

At the time Libellant accepted employment on the SHELLFISH he was told that Seitter, O'Neal and Smith would compose the three-man crew. When these men began shrimping operations out of Morehead City, each performed his assigned duties in accordance with this understanding. The men worked together in this manner for approximately four weeks. A week before the accident Seitter decided to return to North Carolina and left Smith and O'Neal to continue the trawling operations. This they were attempting to do when the accident occurred.

Respondent claims that the SHELL-FISH was operated customarily with a two-man crew. He indicated that he was, more or less, "along for the ride" and that the labors which he contributed to the operation could have been performed by one of the other crewmen.

> " * * * What is customary in a trade may be evidence of due care— here the reasonable fitness element on the concept of seaworthiness— but it is not the legal measure of the duty." June T., Inc. v. King, supra.

The facts in this case compel a finding of unseaworthiness. The vessel had left port with three crew members, all of whom had worked together for weeks. Seitter departed leaving his double-rigged shrimp trawler with a crew of two. The vessel was not equipped with an automatic pilot.

For all practical purposes, Captain O'Neal could not perform the duties of a crewman. He was Master at the wheel, which was without an automatic pilot. Smith had to attempt to serve as deck and winch hand both, an impossible task. He was to bring up the try-net, dump it, assort the shrimp, wash away the trash, and run the winch. Without assistance from O'Neal in emptying the try-net and raking away the trash, Smith would have been delayed in running the winch. Some duties were neglected so that more important ones could be performed. There was too much work here for one crew member to handle. In June T., Inc. v. King, supra, Judge Brown commented that:

> " * * * Conducting the operations with a single crewmember, the seaman hauling in nets from the starboard side could not be both on the starboard side as occasion demanded and on the port side to stop the winches if trouble arose. The fact finder had a rational basis for concluding that for the operations contemplated, there was more for one man to do than was reasonably prudent. Of course, to be inadequately or improperly manned is a classic case of an unseaworthy ves-

sel. See Boudoin v. Lykes Bros. S. S. Co., Inc., 1955, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354, 1955 A.M.C. 488."

An unseaworthy condition must be a cause of injury for a right of action to result. Fox v. The S. S. Moremacwind, 285 F.2d 222 (4 Cir. 1960). The fact that the SHELLFISH operated with an insufficient crew was a cause of Smith's injury. In the first place, Libellant was solicited for the job as a deck hand and he accepted employment in that capacity. He became winch operator only upon Seitter's departure. Up to that time he had served entirely as a deck hand even though he was an experienced winchman. Had the vessel been manned properly, Smith probably would not have been operating the winch. Secondly, had another crew member been aboard, the deck would have been washed off and the sea waste would have been disposed of. That might have avoided the accident.

> " * * * What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1959).

Respondent fails to meet the standard of reasonable fitness of his vessel. At the time of Libellant's injury, the SHELL-FISH had only a two-man crew and no automatic pilot. She was not reasonably suitable for a double-rig trawling operation.

The plea of contributory negligence is without merit. While it is true that Libellant had been warned repeatedly about the danger involved in spooling the cable and was spooling at the time of the accident, the court is of the opinion that

this was not a cause of the accident. Libellant's loss of balance as the vessel turned caused him to fall within the winch.

██ Libellant's injury occurred on October 27, 1962, and he reached his maximum cure in May, 1963. He has a permanently disabled right index finger which should be amputated. The court finds that libellant is entitled to recover damages as follows:

| | |
|---|---|
| Maintenance (Including $600. attorney's fee) | $2,160.00 |
| Cure | 300.00 |
| Loss of earnings | 1,137.50 |
| General damages for pain and suffering and loss of earning power. | 1,500.00 |
| Total | $5,097.50 |

Proctor for Libellant will submit a proposed decree in accordance with this opinion.