Tomas **AGUIRRE, Jr., Apolinar Compean, and Wilhelm Seafoods, Inc.,** Plaintiffs-Appellees,

v.

**CITIZENS CASUALTY COMPANY OF NEW YORK, Defendant-Appellant.**

No. 30364.

United States Court of Appeals, Fifth Circuit.

March 26, 1971.

Gordon L. Briscoe, Harlingen, Tex., for defendant-appellant.

John Wm. Black, Cox, Wilson, Duncan & Black, Brownsville, Tex., for plaintiffs-appellees.

Before WISDOM, THORNBERRY and DYER, Circuit Judges.

DYER, Circuit Judge:

Citizens Casualty Company, a marine insurer, appeals from the District Court's judgment awarding damages to Tomas Aguirre, Jr., Apolinar Compean, and Wilhelm Seafoods, Inc., for the grounding of their shrimper O/S Miss Esmeralda. The insurer argues that the owners' operation of the Miss Esmeralda with a two-man crew made the vessel unseaworthy at the time of the accident. Consequently, Citizens contends, the trial court erred in failing to hold that the owners' breach of the express warranty of continuing seaworthiness in their AHAB marine hull insurance policy suspended coverage and relieved the insurer of liability for damages, regard-

less of whether or not the breach contributed to the grounding. We reverse.

On April 6, 1968, the *Miss Esmeralda* sailed from Port Isabel, Texas, to trawl for shrimp in the Gulf of Mexico. When she weighed anchor, the shrimper was manned by two men, Captain Reyes and Atanacio ("Tanis") Villaneuva. Although the vessel usually carried a three-man crew, it had been manned by two men on three previous trips in 1968. At least one of the owners, Compean, knew that the *Miss Esmeralda* would be two-handed during the April voyage; indeed, he arranged for Tanis to accompany Reyes.

For two days the *Miss Esmeralda* fished approximately ten miles off the coast near Port Mansfield, Texas. On the morning of April 8, Reyes decided to trawl closer to shore. The vessel began operating on a south southeast-north northwest course parallel to the coast and one to one-and-one-half miles offshore. About 11 a. m. a thick fog blanketed the area where the *Miss Esmeralda* was trawling. After a test with a try net produced no signs of shrimp, Reyes decided to quit fishing. He ordered Tanis to raise the boards and nets, so that they could put into Port Mansfield. Reyes changed course from south southeast to southeast, away from the beach. He engaged the automatic pilot and left the wheelhouse to help Tanis raise the boards.

Soon after he began working with Tanis, Reyes noticed that the trawls on the starboard side of the vessel were not coming out of the water as rapidly as those on the port. The starboard boards, in the water two or three minutes longer than the port, acted as a rudder causing the boat to veer to the southwest and toward the shore. Whether Reyes was cognizant of this change in course is disputed, but he remained at the stern to assist Tanis "because I felt confident that we were some distance from the shore at the time." The captain's confidence was short-lived; for two or three minutes after the vessel headed southwest, she ran aground a short distance from the beach.

■ Subsequently arrangements were made to salvage the *Miss Esmeralda*. After extensive repairs she returned to shrimping. The parties do not dispute the cost of the repairs or the sue and labor expense. The insurer denies liability solely on the basis of its policy, which contains an express warranty of seaworthiness. According to the policy, it is "warranted that at the inception of this policy the vessel shall be in a seaworthy condition and, thereafter, during the currency of this policy, the assured shall exercise due diligence to keep the vessel seaworthy, and in all respects fit, tight, and properly manned, equipped and supplied." The insurer contends that operation of the *Miss Esmeralda* with two, rather than three, men rendered her unseaworthy. Thus, by virtue of the owners' breach of the express warranty, coverage under the policy was suspended or avoided during the *Miss Esmeralda's* ill-fated voyage. At least, the insurer argues, coverage was suspended during those periods between April 6 and April 8 when the shrimper was engaged in operations requiring a three-man crew. If breach of the express warranty automatically suspended coverage under the policy, the question whether unseaworthiness proximately caused or contributed to the grounding becomes irrelevant. Gulfstream Cargo, Ltd. v. Reliance Insurance Co., 5 Cir. 1969, 409 F.2d 974, 983 n. 28; *see* Tropical Marine Products, Inc. v. Birmingham Fire Insurance Co., 5 Cir. 1957, 247 F.2d 116, 122–123, cert. denied, 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260; Saskatchewan Government Insurance Office v. Spot Pack, Inc., 5 Cir. 1957, 242 F.2d 385, 388.

■ Unseaworthiness is a condition. How that condition arose, whether by negligence or otherwise, is irrelevant to the owner's liability for personal injury or damage resulting from it. Usner v. Luckenbach Overseas Corp., 1971, 400 U.S. 494, 498, 91 S.Ct. 514, 27 L.Ed.2d 562. In this sense, the owner's responsi-

bility for unseaworthiness is a species of liability without fault. Boudoin v. Lykes Brothers S. S. Co., 1955, 348 U.S. 336, 338, 75 S.Ct. 382, 99 L.Ed. 354. While his warranty of seaworthiness does not mean that his ship can weather all storms, it does indicate that the vessel is reasonably fit for the intended use. *See* Boudoin v. Lykes Brothers S. S. Co., *supra,* at 339, 75 S.Ct. 382, 99 L.Ed. 354. There is no reason to distinguish, for purposes of the warranty, between the ship and the gear on the one hand and the ship's personnel on the other. Waldron v. Moore-McCormack Lines, Inc., 1967, 386 U.S. 724, 727, 87 S.Ct. 1410, 18 L.Ed.2d 482; Boudoin v. Lykes Brothers S. S. Co., *supra,* 348 U.S. at 339, 75 S.Ct. 382, 99 L.Ed. 354. An inadequate crew, whether for the entire voyage or for a particular task on that voyage, is a classic example of an unseaworthy condition. Waldron v. Moore-McCormack Lines, *supra,* at 727–728, 87 S.Ct. 1410, 18 L.Ed.2d 482; June T, Inc. v. King, 5 Cir. 1961, 290 F.2d 404, 406. That this condition is merely transitory is irrelevant with regard to the owner's liability for damage which occurs during its tenure. *See* Usner v. Luckenbach Overseas Corp., *supra,* 400 U.S. at 498, 91 S.Ct. at 517, 27 L.Ed.2d 562; Waldron v. Moore-McCormack Lines, *supra,* 386 U.S. at 727 & n. 5, 87 S.Ct. 1410, 18 L.Ed.2d 482; Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 549, 70 S.Ct. 926, 4 L.Ed.2d 941.

■ Determining the seaworthiness of a vessel at a particular moment in time is the responsibility of the trier of fact. Gulfstream Cargo, Ltd. v. Reliance Insurance Co., *supra,* 409 F.2d at 980; June T, Inc. v. King, *supra,* 290 F.2d 406–407; *see* Waldron v. Moore-McCormack Lines, *supra.* When sitting without a jury, the trial judge's findings as to seaworthiness are protected by the "clearly erroneous" rule from appellate disapprobation. Gulfstream Cargo, Ltd. v. Reliance Insurance Co., *supra,* 409 F. 2d at 980; Hanover Fire Insurance Co. v. Holcombe, 5 Cir. 1955, 223 F.2d 844, 845–846; cert. denied, 350 U.S. 895, 76

S.Ct. 154, 100 L.Ed. 787; see June T. Inc. v. King, *supra,* 290 F.2d at 405; Fed.R.Civ.P. 52. However, having carefully considered all the evidence and testimony presented in this controversy, we are "left with the definite and firm conviction that a mistake has been committed." Hanover Fire Insurance Co. v. Holcombe, *supra,* 223 F.2d at 846 & n. 1 (Rives, J., dissenting). We hold that under these circumstances the insurer has sustained its burden of proving that the vessel was unseaworthy, because of insufficiency of crew, at the time she ran aground. *See* Saskatchewan Government Insurance Office v. Spot Pack, Inc., *supra,* 242 F.2d at 389; Hanover Fire Insurance Co. v. Holcombe, *supra,* 223 F.2d at 846; Ideal Cement Co. v. Home Insurance Co., 5 Cir. 1954, 210 F. 2d 937, 938.

■ Here the pertinent sequence of events begins with the failure of the starboard boards to leave the water as quickly as the port trawls. Acting as a rudder, the starboard boards impelled the *Miss Esmeralda* to veer toward the beach. The District Judge found that Reyes was cognizant of the shrimper's change in course prior to her grounding. Therefore, he concluded, Reyes' negligence was the proximate cause of the grounding. According to the District Judge, the vessel was seaworthy, since raising the boards and nets is ordinarily a job for one man. We cannot accept this rationale for determining that the insurer was liable under its policy. First, we find nothing in the record to substantiate the statement that Reyes knew of the change in course before the accident. Indeed, the only reasonable implication derivable from his testimony is that the captain perceived nothing unusual until he felt a "bump". Immediately he and Tanis ran to the wheelhouse and attempted to move the boat off the beach. Their remedial action was too late, for "[i]t was already too far ashore." At the time the *Miss Esmeralda* was five yards offshore, but Reyes could see only the edge of the beach. Thus neither he nor Tanis had

had any opportunity to visually correct Reyes' belief that they were "some distance away from the shore" while they were raising the boards. Moreover, since the shrimper was unequipped with radar, the evident thickness of the fog prevented Reyes' observation of his actual distance from the beach, wherever he stood on the boat.

■ Second, irrespective of Reyes' purported negligence, the record conclusively discloses that the *Miss Esmeralda* was unseaworthy at the time she ran aground. Although raising the boards may ordinarily be a one-man operation, it certainly became a two-man task under the circumstances *sub judice*. When the starboard and port boards rose unevenly, Reyes encountered a dilemma. If he returned to the wheelhouse, he risked injury to Tanis or damage to the nets or the vessel. *See, e. g.*, June T, Inc. v. King, *supra*, 290 F.2d at 406–407. If he remained at the stern, he risked malfunction of the automatic pilot or a course change caused by drag of the starboard nets, and consequent grounding. Confronted by this quasi-Hobson's choice, Reyes decided, whether consciously or unconsciously, to remain at the stern. Necessarily, then, the wheel, compass, and fathometer remained unattended. Reyes testified that if three men comprise the crew, "[w]hen the bad weather is in one remains in the cabin to watch and see if there is another boat coming in or if you are very near the beach * * * [In foggy weather] many times the captain remains in there." He also stated that to raise the nets smoothly requires two men: if necessary, one can do the job—but not as well or as safely as two. This Court has noted: "What is customary in a trade may be evidence of due care—here the reasonable fitness element on the concept of seaworthiness—but it is not the legal measure of the duty." June T, Inc. v. King, *supra*, 290 F.2d at 406. It is obvious that under these circumstances and at this time, the *Miss Esmeralda* required a three-man crew, two to raise the nets at the

stern and one to check the compass and fathometer in the wheelhouse. The inescapable conclusion remains that the vessel was unseaworthy when she ran aground. Consequently the owners' breach of their express warranty of seaworthiness suspended coverage under the insurance policy. The insurer cannot be liable for damages suffered while coverage was suspended. *See, e. g.*, Tropical Marine Products, Inc. v. Birmingham Fire Insurance Co., *supra*, 247 F.2d at 122–123; Saskatchewan Government Insurance Office v. Spot Pack, Inc., *supra*, 242 F.2d at 388.

■ When the owners attempt to shore up the District Court's finding of seaworthiness by distinguishing other two-handed shrimper crew cases, they navigate dire straits. Ostensibly the owners are contending that in spite of the express warranty, coverage under the policy may be suspended or avoided only when unseaworthiness is a proximate cause of personal injury aboard the vessel. Their assertion contradicts the language of *Tropical Marine Products, Inc.*, *supra*, and *Spot Pack, Inc.*, *supra*. In any event, since Reyes was not endowed with the ability to bilocate, unseaworthiness did exist. Moreover, it is clear that this unseaworthiness and the grounding were causally connected. *June T, Inc.*, *supra*, and Sams v. Haines, S.D.Ga.1969, 299 F.Supp. 746, present the factual converse of this situation. In those cases the master remained in the wheelhouse to protect the vessel; the crewman, trying to perform a task beyond his capability and therefore unsafe, sustained injury. Nevertheless, the legal principles applied to determine seaworthiness in those controversies are identical to the principles which we have utilized here. Certainly the result reached does not depend on the type of injury or damage incurred. *See also* Gulf Coast Trawlers, Inc. v. Resolute Insurance Co., S.D.Tex.1965, 239 F.Supp. 424; Smith v. Seiter, E.D.N.C.1964, 225 F.Supp. 282.

Finally we conclude that Wilburn Boat Co. v. Fireman's Fund Insurance Co.,

1955, 348 U.S. 310, 75 S.Ct. 368, 99 L. Ed. 337, is inapposite to the present controversy. *See* Kossick v. United Fruit Co., 1961, 365 U.S. 731, 742, 81 S.Ct. 886, 6 L.Ed.2d 56; Fireman's Fund Insurance Co. v. Wilburn Boat Co., 5 Cir. 1962, 300 F.2d 631, 647 n. 12. The seaworthiness standard is solidly entrenched in federal maritime jurisprudence.

The District Court's judgment is Reversed.