**MISSOURI DRY DOCK & REPAIR COMPANY, INC. and Delta Enviro–Tech, Inc., Plaintiffs,**

v.

**M/V STE. GENEVIEVE, in rem, and St. Paul Fire & Marine Insurance Co., d/b/a Neare, Gibbs & Co., Defendants.**

**MARINE LEARNING INSTITUTE, Defendant/Third–Party Plaintiff,**

v.

**MIDLAND ENTERPRISES INC., Ohio River Company and The Greater Cincinnati Tall Stacks Commission, Inc., Third–Party Defendants.**

No. 1:93CV5–DJS.

United States District Court, E.D. Missouri, Southeastern Division.

Nov. 2, 1994.

---

3. *Carr* was decided under Ohio law which provides that "[a] person who claims to have been a victim of economic duress must show that he or she was subjected to '. . . a wrongful or unlawful act or threat, . . .' and that it '. . . deprive[d] the victim of his unfettered will.'" *Carr*, 817 F.Supp. at 58 (quoting *Blodgett v. Blodgett*, 49 Ohio St.3d 243, 551 N.E.2d 1249 (1990) (citations omitted)).

Daryl F. Sohn, Goldstein and Price, Teresa A. McNail, Associate, Greensfelder and Hemker, St. Louis, MO, for plaintiff Missouri Dry Dock & Repair Co., Inc.

Gary D. McConnell, Peper and Martin, St. Louis, MO, for intervenor plaintiff Delta Enviro–Tech, Inc.

Daniel C. Aubuchon, President, Aubuchon and Raniere, St. Louis, MO, for defendants M/V Ste. Genevieve, her engines, tackle, etc., in rem and Marine Learning Institute.

Ronald E. Fox, Bart C. Sullivan, Sandberg and Phoenix, St. Louis, MO, for defendant St. Paul Fire and Marine Ins. Co. d/b/a Neare, Gibbs & Co.

Richard J. Mehan, Jr., Gundlach and Lee, St. Louis, MO, Todd M. Powers, Rendigs and Fry, Cincinnati, OH, for third-party defendants Midland Enterprises, Inc. and Ohio River Co.

Lisa A. Green, Stefan J. Glynias, Evans and Dixon, St. Louis, MO, Lawrence R. Elleman, Rita A. Miller, Dinsmore and Shohl, Cincinnati, OH, for third-party defendant The Greater Cincinnati Tall Stacks Com'n, Inc.

## MEMORANDUM AND ORDER

STOHR, District Judge.

This action was tried to the Court sitting without a jury on December 8, 9, 10 and 13, 1993. All claims involving plaintiff Delta Enviro–Tech, Inc., defendant St. Paul Fire & Marine Insurance Co., and third-party defendants Midland Enterprises Inc. ("Midland") and The Ohio River Company ("Ohio River") have been settled and were dismissed with prejudice on December 6, 1993. Remaining for trial were the claims of plaintiff Missouri Dry Dock ("MDD") against the M/V Ste. Genevieve *in rem* and Marine Learning Institute ("MLI"), and the claims of MLI against third-party defendant The Greater Cincinnati Tall Stacks Commission, Inc. ("Tall Stacks").

On October 1, 1992, the Ste. Genevieve sank in the Mississippi River near Charleston, Missouri, en route to Cincinnati, Ohio to participate in the "Tall Stacks '92" festival scheduled for October 14 through 18. MDD filed this action against the vessel *in rem* and its owner, MLI, seeking payment for repairs, dry dock fees and fleeting charges allegedly incurred by it after the Ste. Genevieve was towed to MDD in Cape Girardeau, Missouri following the sinking. MLI in turn brought a third-party complaint against Tall Stacks, and seeks indemnification on MDD's claims against MLI as well as additional damages, both predicated upon Tall Stacks' agreement with MLI concerning the Ste. Genevieve's participation in the festival.

The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, in accordance with Fed.R.Civ.P. 52(a).

### Findings of Fact

1. Defendant M/V Ste. Genevieve is a steam operated dredge, built in 1932, approximately 200' long by 48' wide.

2. The Ste. Genevieve was retired from service with the Army Corps of Engineers in 1985.

3. Defendant Marine Learning Institute is a not-for-profit corporation with its offices in Portage Des Sioux, Missouri. Its president is Mr. Richard Wooten. Its vice-president is Mr. Scott Wooten, Richard's son.

4. From October 1, 1990, MLI owned the Ste. Genevieve pursuant to the terms of "Vessel Conditional Transfer Document" executed by Richard Wooten and Mr. Stanley G. Spadoni, on behalf of "the United States of America, acting by and through the State of Missouri State Agency for Surplus Property."

5. MLI's mission involves educational projects and programs with an environmental and marine emphasis. MLI acquired the retired Ste. Genevieve for use as a museum with a target audience of school children.

6. Defendant Tall Stacks is an Ohio not-for-profit corporation which organized the "Tall Stacks '92" festival featuring a number of historical sternwheeler and other similar boats, to be held in Cincinnati, Ohio on October 14 through 18, 1992.

7. MLI received a formal invitation for the Ste. Genevieve's participation in the festival from Mr. Dan Ricciardi, who identified himself to Richard Wooten as a member of the Tall Stacks Commission, but also as asso-

ciated with both Ohio River and Midland, Ohio River's parent company.

8. Mr. Ricciardi was Manager of Barge Maintenance and Repair for Ohio River, and was the chairman of Tall Stacks' River Operations Committee for the 1992 festival.

9. In one of their conversations concerning the Ste. Genevieve's potential participation in the Tall Stacks festival, Richard Wooten told Ricciardi that the bottom of the Ste. Genevieve's hull had been replated before the dredge was retired by the Corps of Engineers in 1982, and that the Ste. Genevieve needed to be painted. Richard Wooten made no other representations to Ricciardi concerning the Ste. Genevieve's condition.

10. Over a period of years in the 1960's and 1970's, the Ste. Genevieve's hull had been largely replated by the Corps of Engineers.

11. Mr. Ricciardi notified Mr. Wooten that someone would come to look at the Ste. Genevieve, and a Mr. David Griggs, a Barge Maintenance Supervisor employed by Ohio River, was sent. Mr. Griggs himself had no affiliation with Tall Stacks; his involvement with the Ste. Genevieve was at the direction of Dan Ricciardi, who was his supervisor with Ohio River.

12. The principal purpose of Mr. Griggs' visit was to assess the Ste. Genevieve's merit as an attraction at the festival.

13. At that time, the Ste. Genevieve was located in St. Charles, Missouri, where it had no gangplanks and had to be reached by boat.

14. Mr. Griggs and Mr. Wooten went out to the Ste. Genevieve in a boat rented by Griggs. Mr. Griggs examined the Ste. Genevieve for approximately thirty minutes. During this visit, portions of the Ste. Genevieve were locked and Mr. Wooten did not have the keys to open them. Griggs claims that he asked about the hull and that Wooten said it had recently been replated and had no leaking compartments.

15. On two later occasions, Griggs visited the Ste. Genevieve again to check the progress of its painting and general preparation for the festival. During those visits, Griggs neither saw nor smelled anything to indicate that the hull was other than dry.

16. On Griggs' third visit to the Ste. Genevieve, the port bow compartment was being pumped out, and Scott Wooten told Griggs that he was pumping out rainwater.

17. Ricciardi and Griggs never discussed the Ste. Genevieve's ability to make the trip to the festival, and based on his three visits to the vessel, Griggs knew of no reason that the Ste. Genevieve was not capable of the trip.

18. An agreement was entered into between Tall Stacks and MLI in August, 1992, in which Tall Stacks agreed to pay MLI $20,000 for the Ste. Genevieve's participation in the Tall Stacks '92 festival.

19. On behalf of Tall Stacks, Jay Downie, the event producer, signed the agreement in the name of Richard Greiwe, Tall Stacks' Executive Director. This was done with Mr. Greiwe's authorization and approval.

20. Richard Wooten intended to use the $20,000 to repair and paint the Ste. Genevieve in preparation for her appearance in the festival.

21. Tall Stacks agreed to provide the Ste. Genevieve transportation to the festival; the transportation services were donated to Tall Stacks by Ohio River. The value of those services is estimated at $80,000.00.

22. Tall Stacks also agreed to provide MLI and the Ste. Genevieve with insurance in connection with the event in the amounts of $250,000 coverage for hull and machinery and $1,000,000 coverage under a protection and indemnity (P & I) policy. The policies obtained were for the period August 31, 1992 to November 15, 1992. Tall Stacks was the primary insured on the policies, and MLI was named as an additional insured and loss payee.

23. MLI had no concerns about the Ste. Genevieve's ability to make the trip; to MLI's knowledge, the hull had no serious leaks, although MLI hoped some day to have enough money to replate the Ste. Genevieve's hull if it proved necessary.

24. Richard Wooten has no experience in the operation, repair or valuation of inland river vessels.

25. Richard Wooten asked Mr. Ricciardi to provide pumps and other gear necessary to make the trip to the festival safely, and Mr. Ricciardi indicated those needs would be taken care of.

26. When MLI took possession of the Ste. Genevieve in 1990, the dredge was located in Davenport, Iowa. Before bringing the Ste. Genevieve to Missouri, MLI was required to obtain a trip and tow survey for insurance purposes. This survey, dated August 16, 1990, was never offered to Tall Stacks, Ohio River or Midland.

27. Among the conclusions expressed in this survey was the following: "In the event the vessel should be moved from its present location it is our further recommendation that someone knowledgeable of the vessels [sic] hull characteristics and damage control procedures be onboard during transit from origin to destination."

28. Prior to its departure for the festival, portions of the Ste. Genevieve's hull plating were in a deteriorated condition. Most notably, the #7 stern compartment had a number of rust holes which allowed the ingress of some water into the hull, though not enough to create an immediate risk of sinking. In the #2 port wing tank, in an area from which a discharge pipe protruded from the hull plating, there existed a vertical fracture. A number of the bulkheads between the various hull compartments were not watertight, in many instances due to openings which had been made to allow pipes to pass between compartments.

29. Mike Livingston, a friend of Scott Wooten, owns and operates a business called Livingston Wood Floors. For a number of weeks prior to the Ste. Genevieve's departure from Grafton, Livingston and Scott Wooten worked on painting portions of the exterior of the Ste. Genevieve. Livingston also intended to sand and resurface the Ste. Genevieve's floors once she reached Cincinnati.

30. MLI indicated to Mr. Ricciardi that Mike Livingston and Scott Wooten wanted to be on the Ste. Genevieve during the move, in part merely to be "along for the ride," but also to work on cosmetic repairs to ready the dredge for the festival. Ricciardi told Scott Wooten that the two would have to ride on the tug or towboat, rather than on the Ste. Genevieve itself.

31. The Ste. Genevieve began the trip to Cincinnati in late September, 1992, and was moved from its home port in Grafton, Illinois to St. Louis, Missouri by the M/V Senator Dixon.

32. In St. Louis, the towboat Tom Talbert picked up the Ste. Genevieve for tow. The Ste. Genevieve was placed at the head of the tow, with a barge on either side of it to protect it and to allow the tow to be steered without pressure against the sternwheel of the Ste. Genevieve.

33. Captain John Choate of the Tom Talbert asked Scott Wooten if the Ste. Genevieve was dry or taking on any water, and Wooten indicated it was dry.

34. Captain Choate inspected the Ste. Genevieve the night before taking it into the tow, and saw no water or anything else to indicate the Ste. Genevieve was not capable of the trip. He did not enter any hull compartments, but at points the interior of the hull can be seen from the main deck through openings around the machinery.

35. The Ste. Genevieve did not having working pumps or a working radio on board during the tow.

36. Captain Choate allowed Scott Wooten and Mike Livingston on the Ste. Genevieve during the tow, but only on the second deck and on the condition that they wear life jackets.

37. Members of the Tom Talbert's crew checked the tow once each watch, every six hours, and no one reported to Captain Choate that there was water in the Ste. Genevieve's hull.

38. On October 1, 1992, approximately two days after its departure from St. Louis, the tow arrived at Moore's Landing, near Charleston, Missouri, and the entire tow was placed in the lower fleet.

39. Sometime after 6:00 p.m., two tugboats, the John Welch and the Redbird, moved the Ste. Genevieve from the lower fleet to the upper fleet, several miles upstream.

40. During the move, Scott Wooten was aft on the Ste. Genevieve's second deck.

41. On the lower fleet, the John Welch tied up to the Ste. Genevieve loosely midship, port side to port side, with approximately three feet of slack in the lines, which allowed the two to knock together.

42. When Scott Wooten pointed this out to personnel on the John Welch, he was told that, once in the river, the John Welch would come around back of the Ste. Genevieve to push.

43. Once in the river, the Redbird tied tightly on to the Ste. Genevieve, starboard to starboard. The John Welch did not move to the rear at any time during the move.

44. After tying off at the upper fleet, Scott Wooten and Mike Livingston boarded the John Welch and entered the pilot house to inquire about the line boat which was to take the Ste. Genevieve on to Cincinnati, on which they assumed they would have dinner and sleep that night.

45. The Captain of the John Welch, named Alan Duenne, and Scott Wooten both talked to David Griggs on the telephone from the John Welch's pilot house, and Griggs asked Wooten and Livingston to stay on the Ste. Genevieve that night, after getting dinner on a line boat to which the John Welch would take them.

46. When Captain Duenne started to pull the John Welch out into the river, away from the Ste. Genevieve, the back end of the John Welch struck the Ste. Genevieve in the area of the Ste. Genevieve's # 2 port wing tank. The contact between the John Welch and the Ste. Genevieve was not out of the ordinary or unforeseeable in the context of river towage.

47. Some time later, after the Ste. Genevieve had been raised and placed in dry dock, Scott Wooten saw a hole in the Ste. Genevieve's hull at approximately the point on the # 2 port tank at which the John Welch struck the Ste. Genevieve.

48. Once to the upper fleet, the Ste. Genevieve was tied to a coal barge with the Ste. Genevieve facing downstream and its port side open to the river.

49. After eating dinner on another boat, the John Welch returned Scott Wooten and Mike Livingston to the Ste. Genevieve at about 10:00 p.m., at which time they saw nothing unusual and went to bed.

50. Scott awoke at approximately 11:00, and saw that the windowsill and door of the cabin in which he slept were tilted rather than lying level.

51. After getting dressed, Scott shone a flashlight down the port side of the Ste. Genevieve and saw water 6″ to 1′ below, instead of the usual 3′ below.

52. Scott saw and heard water rushing into the Ste. Genevieve's hull compartments as he and Livingston got off the vessel.

53. Scott fired a flare gun and sounded an air horn.

54. Approximately ten minutes later, someone appeared on the bank and was asked to get help. Although he could not see the person clearly in the dark, Scott believed he had a hand-held radio, because he shortly responded that two boats would be there in twenty to twenty-five minutes.

55. Approximately twenty-five minutes later, the John Welch arrived and helped Wooten and Livingston off the fleeting barge to dry ground. By that time, the Ste. Genevieve had already gone over on her side and hit bottom.

56. During the Ste. Genevieve's sinking, no efforts were made to save her.

57. The salvage operations succeeded in raising the Ste. Genevieve on November 1, 1992.

58. Coast Guard Chief Petty Officer George Evans, of the Paducah, Kentucky Marine Safety Office, was assigned to investigate the sinking of the Ste. Genevieve. He went to Moore's Landing and saw the wreck, conducted interviews, and viewed the vessel several times while in dry dock.

59. The Narrative Supplement to the Marine Casualty Investigation Report prepared concerning the sinking noted:

> C-shaped fracture found in #2 port wing tank side plating in way of area 4″ aft transverse bulkhead at (fr24) extending from approx 5′ 2″ draft mark upwards for approx 24″ to within 18″ of maindeck. A 4″ overboard discharge scupper terminated in center of fractured area and projected approx 4″ outwards from hull plating. The fractured area was set in 2–4″. The upper and lower portions of the fracture appeared freshly made, and extended aft from an older vertical fracture which apparently pre-existed these damages. A 2nd fracture, similar size, location and age was found approx 4″ forward of same bulkhead.

60. The contact between the Ste. Genevieve and the John Welch caused an aggravation or enlargement of pre-existing fractures in the #2 port compartment of the Ste. Genevieve's hull, at or near the waterline. In combination with the pre-existing deterioration of the hull (particularly numerous holes in the #7 stern compartment) and the lack of watertightness in some of the transverse bulkheads, the enlarged fracture in the #2 compartment allowed the hull to take on sufficient water to cause the Ste. Genevieve's sinking.

61. Without the enlarged fracture in the #2 port compartment, the Ste. Genevieve would not have sunk as it did on October 1, 1992. If the transverse bulkheads of the Ste. Genevieve had been watertight and the stern of the hull not had the holes it did, the aggravated #2 port wing tank fracture would not have resulted in the sinking on October 1.

62. Plaintiff Missouri Dry Dock & Repair, Inc. is a corporation which operates a shipyard at Cape Girardeau, Missouri. Mr. Robert Erlbacher II has been MDD's president since 1970.

63. MDD's Cape Girardeau facility has two dry docks, one for smaller vessels, the other for larger vessels. The dry docks allow a vessel to be lifted above the water for repairs to its underside.

64. On November 9, 1992, at the request of MLI, MDD placed the Ste. Genevieve on MDD's larger dry dock to enable MLI's representatives to inspect the dredge in order to determine what repairs needed to be performed to its hull as the result of the sinking at Charleston the previous month.

65. A letter dated November 9, 1992 from Mr. Kent E. Hoffmeister, MDD's General Manager, to Mr. Scott Wooten, MLI's vice president, sets out prices for "dry docking and selected repairs" to the Ste. Genevieve, including the following:

1. Dry Dock and Blocking...$6,500.00
2. Cut 8″ × 8″ drain holes in bottom of vessel for washing and cleaning hull compartments and providing and welding 12″ × ⅜″ × 12″ doublers over holes when washing and cleaning is complete.................$ 100.00 each

The letter also contains the following paragraph:

> Should at anytime work be stopped for a 24 hour period awaiting decision on scope or authorization to proceed a "Lay Day" charge will be assessed to the owner, following the first 24 hour period, of $2,500.00 per each 24 hour period of indecision or withholding of authorization to proceed. Following undocking and refloating of the dredge and completion of work by Missouri Dry Dock the owner shall remove the vessel from the shipyard within a five day period. Should the vessel not move from the yard within the designated time, Cape Girardeau Fleeting Company will move the dredge to their fleet and fleet the dredge at a cost to the owner of $100.00 per calendar day plus tug time at $120.00 per hour.

66. On page 2 of the letter, next to the signature of Mr. Hoffmeister, appears the signature of Richard Wooten, above his handwritten indication that he signed the letter-agreement as president of MLI on November 9, 1992.

67. On November 9, 1992, Mr. Erlbacher inspected the Ste. Genevieve for hull damage and other needed repairs. He found that the sternmost hull compartment had a number of holes and a starboard compartment had

some holes as well. Mr. Erlbacher estimates the total number of holes at between 25 and 50, some as large as 3″ in diameter. In Mr. Erlbacher's opinion, at least some of the leaking of the stern section was due to deterioration of the original metal plating. There also appeared to be some oil in the leakage, creating a pollution risk.

68. MDD attempted to attach "doublers" or temporary plates to stop the hull's leakage, but the attempt was not successful. To prevent further leaking, MDD placed the dredge back in the water, to allow the compartments to fill rather than continue to leak potentially polluted water. For this work, MDD charged MLI $800.

69. Following Delta Enviro–Tech's placement of an oil containment boom on the downstream end of the dock and other precautionary measures, the Ste. Genevieve was dry docked a second time.

70. By letter dated November 10, 1992 addressed to Scott Wooten, Mr. Hoffmeister outlined what MDD had attempted with the dredge to that time, and indicated its intention to again attempt to repair "holed areas" in the stern by patching them with ¼″ plate doublers. The letter suggests that if the use of doublers proved unsuccessful because of the "thin shell plating," that the "only alternative would be to replate the stern" at a cost of approximately $35,000. Mr. Hoffmeister estimated that, in the event re-plating was not necessary, the repairs could be completed by November 12, 1992.

71. In response, MLI instructed MDD to attempt the doubler plate repair. The use of doublers was not successful because the hull wall was too thin to properly attach the doubler plates. This was tried on November 11. For this attempted repair, MDD charged $2,500.

72. MDD later tried attaching doublers with the use of a rubber gasket, caulking, and even foam rubber carpet backing, but to no avail. The charges incurred in these attempts were between $800 and $900.

73. To this point, MLI paid MDD's dry docking and repair charges in the approximate amount of $13,000.

74. Following MDD's failed repair attempts on approximately the 13th and 16th of November, MDD indicated the only alternative was replating. Richard Wooten responded that MLI did not have the money to pay for replating, but would try to raise it.

75. For the next two weeks, MDD left the Ste. Genevieve in dry dock although it had no authorization from MLI to begin the replating work, because MDD anticipated ultimately doing the work, because undocking and redocking would involve additional charges to MLI, and because of the potential pollution problem.

76. MDD has not sought to impose on MLI "lay day" charges for this two-week period because MDD anticipated that it would ultimately do the replating work and because at that time MDD had no other customer in need of the larger dry dock.

77. In its negotiations with Ohio River and Midland concerning settlement of claims arising from the Ste. Genevieve's sinking, MLI informed Ohio River and Midland of the estimated cost of replating, in hopes that they would be willing to fund the repair.

78. As of December 2, 1992, MLI had not yet authorized MDD to repair the Ste. Genevieve or to remove it from dry dock. On that date, the United States Coast Guard issued a Captain of the Port Order prohibiting the dredge's removal from its present location until certain repairs were made, to guard against the possibility of a second sinking and the attendant pollution hazard.

79. As of December 4, 1992, MLI still not having given MDD directions concerning repair of the dredge, MDD gave notice to MLI that MDD would begin charging MLI $2,500 per day for the use of its dry dock, until the dredge was repaired pursuant to the Coast Guard's order and removed from dry dock.

80. In December, MLI indicated it was still attempting to raise money to pay for replating the Ste. Genevieve.

81. In December, MDD had other customers who would have used the larger dry dock had the Ste. Genevieve not been occupying it.

82. On December 17, 1992, MDD informed MLI that MDD was seeking payment of dry dock charges totalling $35,000 at that time, and that MDD reserved the right to exercise a maritime lien against the dredge unless it received adequate assurance that the charges could be paid.

83. On December 31, 1992, MDD notified MLI that MDD was seeking payment of dry dock charges totalling $70,000 as of that time. MDD further indicated that it had learned that another party, Delta Enviro–Tech, Inc., was claiming a lien against the dredge in the approximate amount of $30,-000, and that the repairs required by the Coast Guard's order would cost at least $35,-000. MDD informed MLI that MDD believed the total amount of liens against the Ste. Genevieve would soon exceed the dredge's value, and that MDD intended to file suit against the Ste. Genevieve unless it received adequate guarantee by January 8, 1993 that all claims could be paid.

84. MDD commenced this action on January 8, 1993.

85. The United States Marshal seized the Ste. Genevieve on January 12, 1993.

86. Between January 8 and 19, MDD made certain repairs to the dredge—minimal replating of the bottom of the stern—so that the Coast Guard would permit the dredge to be removed from dry dock.

87. MDD's invoice for these repairs shows labor charges of $21,037.63, materials charges of $4,651.96, and sales tax on materials of $277.95, for total charges of $25,967.54.

88. The Ste. Genevieve was removed from dry dock on January 19, 1993.

89. MDD prepared an invoice for dry dock charges of $117,500.00 for the period from December 4, 1992 through January 19, 1993, calculated at $2,500 per day for 47 days.

90. From January 20 to the present, MDD has held the dredge in its custody pursuant to this Court's order appointing MDD substitute custodian.

91. To date, no one has sought to release the dredge from seizure.

92. MDD seeks fleeting charges of $100 per day beginning January 20, 1993 for fleeting the Ste. Genevieve.

93. Beginning mid-December, 1992, MDD sent MLI monthly invoices showing the cumulative dry docking, repair and fleeting charges indicated above. MDD has received no payment on these invoices.

94. A typical barge dry docking at MDD is charged at $500, and up to four per day can be done if the repairs performed are minor.

95. The other shipyards nearest to Cape Girardeau which are capable of docking and repairing a vessel the size of the Ste. Genevieve are two shipyards in St. Louis, Missouri and two in Paducah, Kentucky.

96. Okie Moore Diving and Salvage prepared an invoice showing total charges of $203,800.00 in connection with salvage operations to raise the Ste. Genevieve. This invoice was paid by Neare, Gibbs & Co., river marine underwriters, out of the $250,000 proceeds of the hull policy obtained by Tall Stacks pursuant to its agreement with MLI, under which Neare, Gibbs determined the Ste. Genevieve to be a constructive total loss.

### Conclusions of Law
*Third–Party Claims of MLI v. Tall Stacks*

The Court turns first to the claims of MLI against Tall Stacks. The third-party complaint, pled in a single count, makes a single reference to the existence of the agreement between MLI and Tall Stacks; this is found in ¶ 7, which alleges that on or about October 1, 1992, pursuant to the agreement, the Ste. Genevieve was in the process of being transported by the third-party defendants to Cincinnati. The third-party complaint goes on to allege that the third-party defendants:

acting by and through their agents, servants and employees, by reason of their neglect, inattention, and improper and unskillful conduct negligently and carelessly caused the M/V Ste. Genevieve vessel to sink ... causing Third–Party Plaintiff to suffer and incur damages.

Third–Party Complaint, ¶ 8. Viewing the complaint as a whole, particularly the lack of any allegation concerning breach of the par-

ties' agreement and the presence of allegations concerning negligence and carelessness, the Court would have interpreted the third-party complaint as asserting only a tort claim. At trial and in their briefs, however, both MLI and Tall Stacks have presumed that the complaint asserted both a tort and a contract claim, and both parties have addressed only the latter, based upon MLI's indication at trial that it had chosen to abandon any tort claim. In view of this treatment of the issues by the parties, and the requirement of Fed.R.Civ.P. 8(f) that all pleadings be construed so as to do substantial justice, the Court will analyze MLI's claim as sounding in contract.

Section III(F) of the parties' agreement provides, in pertinent part:

> Commission shall have full and total responsibility for the safety and well-being of any and all persons on the Boat. Except as otherwise provided for in this paragraph, Commission shall indemnify, defend and save harmless Owner from and against any and all losses, damages, liabilities, expenses (including reasonable attorney's fees) and costs which may be imposed upon or incurred by Owner, its employees or assigns for whatever reasons, or asserted against Owner, its employees or assigns, arising out of or in connection with the Boat including, but not limited to, the Boat's travel to and from the Event, Participation, and the presence of the Boat in Greater Cincinnati during the Event.

MLI invokes the broad language of this indemnification provision to support its claim that Tall Stacks is liable to MLI for all losses to MLI occasioned by the sinking of the Ste. Genevieve en route to the festival. On its face, the language appears to have the application urged by MLI: MLI has suffered or incurred "losses, damages, liabilities, expenses (including reasonable attorney's fees) and costs" in connection with "the Boat's travel to and from the Event." Tall Stacks asserts a number of defenses to MLI's contractual claim for indemnity.

At the close of trial, Tall Stacks filed with the Court a written motion for leave to amend its answer to conform to the evidence. No written opposition to the motion has been filed. None of the additional affirmative defenses asserted in the proposed amended answer is of a type waived under Fed. R.Civ.P. 12(h)(1) for Tall Stacks' failure to assert it earlier. In addition, Rule 15's liberal policy toward amendment of pleadings is best served by permitting the requested amendment, particularly as the additional defenses have been addressed by the parties' evidence at trial. For these reasons, and consonant with the Court's determination to allow MLI to proceed to trial on a contract claim not clearly stated in its third-party complaint, the Court will grant Tall Stacks leave to amend its answer.

■ First, Tall Stacks argues that MLI made material misrepresentations which induced Tall Stacks to enter into the parties' agreement, and that as a result the agreement is void. Tall Stacks relies on the testimony of Dan Ricciardi and David Griggs that Richard Wooten represented to each of them that the hull of the Ste. Genevieve had been replated in the recent past. The Court has given careful consideration to the testimony of Dan Ricciardi, David Griggs, Richard Wooten, Scott Wooten and Jay Downie. As fact-finder, the Court finds that Richard Wooten made a statement to Dan Ricciardi to the effect that the Corps of Engineers had replated the Ste. Genevieve's hull before its retirement in 1982. That statement, whether or not true, was not specific concerning the timing and extent of any such replating, and did not directly bear on the Ste. Genevieve's condition at the time the statement was made.[1] The hull had in fact been largely replated by the Corps of Engineers, over a period of years in the 1960's and 1970's. The Court also finds that Tall Stacks failed generally to exhibit much interest in the Ste. Genevieve's structural condition prior to entering into the agreement with MLI, and that any comments made on that subject were little more than passing remarks. For these reasons, the Court rejects Tall Stacks'

---

1. The Court notes that the Ste. Genevieve was retired by the Corps of Engineers in 1985, rather than 1982. According to Mr. Ricciardi's testimo-ny, however, Richard Wooten's statement was that the Ste. Genevieve had been replated prior to its retirement in 1982.

contention that the representation made by Richard Wooten was materially relied upon by Tall Stacks in its decision to enter into the parties' agreement.

The Court must also consider Tall Stacks' claims concerning statements made by Richard Wooten to David Griggs. Even if the Court resolves the issue of credibility in favor of David Griggs and against Richard Wooten as to what the latter said in their conversations as to the condition of the hull, the Court would not conclude that any such statement was materially relied upon by Tall Stacks in entering into the agreement with MLI, because Griggs' testimony did not indicate that he had relayed any such statement back to Ricciardi or other decision-makers of Tall Stacks. Finally, Jay Downie, the event producer, testified that he had never asked the Wootens any questions concerning the Ste. Genevieve's condition.[2]

 Tall Stacks' next defense is that any liability under the contract is precluded by MLI's breach of an implied warranty of seaworthiness. The threshold question relevant to this argument is whether the parties' agreement was one in which an implied warranty of seaworthiness is inherent. Tall Stacks characterizes the agreement as a charter-party. In the mid-nineteenth century, the United States Supreme Court twice relied on a hornbook definition of "charter-party" as "a contract by which an entire ship, or some principal part thereof, is let to a merchant for the conveyance of goods on a determined voyage to one or more places." *Ward v. Thompson,* 63 U.S. (22 How.) 330, 333, 16 L.Ed. 249 (1859); *Vandewater v. Mills,* 60 U.S. (19 How.) 82, 91, 15 L.Ed. 554 (1856). Under this mercantile definition, the agreement at issue here would not constitute a charter-party.

The Court's research has uncovered little else in the case law giving guidance as to the precise definition of "charter-party." One modern treatise notes that "[t]he charter party is the principal document of the tramp shipping industry ... [and] is a specialized

form of contract for the hire of an entire ship, specified by name." 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 11–1, p. 169 (2d ed. 1994). The treatise distinguishes three principal forms of charter-party:

> (1) Under a time charter, the charterer engages for a fixed period of time a vessel, which remains manned and navigated by the vessel owner, to carry cargo wherever the charterer instructs; (2) Under a voyage charter, the charterer engages the vessel to carry goods only for a single voyage; and (3) under a demise, or bareboat charter, the charterer takes complete control of the vessel, mans it with his own crew, and is treated by law as its legal owner.

*Id.* This discussion largely retains the mercantile nature of the Supreme Court's earlier definitions, leaving some room, however, under the concept of bareboat charter, for the hire of a ship for purposes other than the carriage of goods. Because in common parlance and usage, "charter-party" continues to connote the shipment of goods, the MLI/Tall Stacks agreement is not a charter party in the typical sense.

Using Schoenbaum's text as definitional, only the third species of charter, the bareboat charter, has any possible application to Tall Stacks' agreement with MLI, and then only on the presumption that the carriage of goods is not a prerequisite. As Schoenbaum emphasizes, the demise charter "is the transfer of full possession and control of the vessel for the period covered by the contract." *Id.* Under such a charter:

> The owner's fundamental obligation ... is to provide a seaworthy vessel of the specified class and type at the beginning of the charter term. A warranty of seaworthiness of the vessel will be implied; it may, however, be qualified or even waived. The seaworthiness warranty extends only to the beginning of the charter; subsequent to delivery the seaworthiness of the vessel

---

**2.** Tall Stacks' contentions concerning MLI's own actual or constructive knowledge of the condition of the hull are not relevant to a determination of whether MLI made misrepresentations which fraudulently induced Tall Stacks into making the agreement, particularly in view of the Court's findings about the representations actually made.

is the responsibility of the charterer unless otherwise stated.

*Id.* at 174.

The Court also notes that, because the parties' contract included Tall Stacks' obligation to provide transportation for the Ste. Genevieve to the festival and back, aspects of the agreement are in the nature of a contract of towage. Under admiralty law, "[t]he principal duty of the tow is to provide a seaworthy vessel with equipment and structural characteristics that are reasonably necessary to undertake the voyage." *Id.* at § 12–6, p. 227. This includes requirements that "[t]he holds ... be sufficiently watertight and the equipment in working order." *Id.*

This hornbook law indicates that if the parties' agreement is construed as either a demise charter or a contract of towage, MLI was under a duty to provide the Ste. Genevieve in seaworthy condition. Furthermore, even if the agreement cannot be analyzed as either of these recognized types of marine contracts, the Court would conclude by analogy that the parties' agreement carried an implied warranty of seaworthiness. Because the purposes of the agreement contemplated and required the Ste. Genevieve's transportation to Cincinnati, the Court finds that the vessel's seaworthiness was necessary to and inherent in the performance of MLI's obligations under the contract. The Court further concludes as a matter of law that the contract's "only agreement" language, found in § VI(B), is not sufficiently clear and unambiguous to serve as an exclusion of the implied warranty. *Id.* at § 11–9, p. 190.

"Seaworthy" generally means fit for the intended purpose. *See, e.g., Boudoin v. Lykes Bros. S.S. Co.,* 348 U.S. 336, 337, 75 S.Ct. 382, 384, 99 L.Ed. 354 (1955); *Aguirre v. Citizens Casualty Company of New York,* 441 F.2d 141, 144 (5th Cir.1971). This definition encompasses the notion that seaworthiness is "a relative term depending upon its application to the type of vessel and the nature of the voyage." *Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1155 (2nd Cir.1978). Here the seaworthiness required for the performance of the parties' contract was minimal. The Ste. Genevieve needed merely to be capable of transport by tug or tow to the festival and to float stably in the water once moored so as to permit tours of the vessel.

Where the captains of the tugboats moving the Ste. Genevieve did not deem it necessary for the dredge to be manned during transport, and given that the tugboats were themselves equipped with pumps and communications equipment, the Court rejects the contention that the lack of a crew and a working radio and pumps in and of itself rendered the Ste. Genevieve unseaworthy. Whether the condition of the Ste. Genevieve's hull rendered her unseaworthy is a closer question. The Court has found that although portions of the hull plating were somewhat deteriorated prior to the Ste. Genevieve's departure for the festival, the Court has also found that the deterioration did not permit the entry of sufficient water into the hull to threaten the Ste. Genevieve with sinking. If not for the C-shaped fracture in the # 2 port wing tank, which occurred during the trip, the Ste. Genevieve would not have sunk when it did. On the other hand, the Court is equally persuaded that the pre-existing lack of watertightness between the hull's bulkheads was a contributory cause of the sinking once the C-shaped fracture occurred and allowed a greater amount of water into the hull.

Having given careful consideration to all these intertwining factors, the Court concludes that the Ste. Genevieve was not reasonably fit for the purposes of the parties' contract for the following reasons. First, the deteriorated condition of the hull allowed the C-shaped fracture to occur in ordinary and foreseeable circumstances of towage in which a less deteriorated hull would not have been so seriously affected. Second, a portion of the C-shaped fracture, surrounding the discharge pipe, predated the Ste. Genevieve's trip to the festival and therefore contributed to an increased likelihood of expansion of the fracture, allowing the hull to take on considerable water. Third, the deteriorated condition of the hull included rust holes which allowed the ingress of additional water. Finally, the lack of watertightness between the bulkheads further increased the Ste. Genevieve's vulnerability to sinking.

The combination of these pre-existing conditions resulted in a susceptibility to sinking under conditions ordinary and foreseeable to towage over the distance contemplated by the parties' contract, such that the Ste. Genevieve was not fit for the purpose intended. The Court therefore concludes that MLI breached a warranty of seaworthiness which was implied in its agreement with Tall Stacks, and that Tall Stacks is not liable to MLI on the basis of the indemnification clause in the agreement. Although the observation is without legal effect, the Court notes its conclusion that MLI's provision of the Ste. Genevieve in an unfit condition was not a willful act on MLI's part, but rather attributable to MLI's lack of knowledge and expertise as to both the condition of the Ste. Genevieve and the rigors of towage.

■ Having determined this defense in Tall Stacks' favor, the Court will treat the remaining defenses in less detail.[3] Tall Stacks next contends that MLI breached the provision of § IV(A) of the agreement that the Ste. Genevieve be in "Class A condition." The Court rejects this argument for several reasons. First, the evidence at trial showed that "Class A condition" is not a term of art, and Tall Stacks was unable to establish any fixed meaning for the term. Second, the plain language of the provision requires that the Ste. Genevieve be in Class A condition "during the Event." The term "Event" is earlier defined in the agreement as the period of the festival celebration itself, from October 14 through October 18. Even if "Class A condition" encompasses the Ste. Genevieve's fitness for towage, the vessel sank on October 1, prior in time to the contract's requirement that it be in Class A condition. If instead Class A condition refers to the Ste. Genevieve's aesthetic appearance and fitness as a festival attraction, the fact that the vessel was not yet fully painted and otherwise readied for tours would not, as of October 1, constitute a breach of the Class A condition requirement stated in the contract.

Another defense asserted by Tall Stacks is that the indemnification clause upon which MLI relies is limited in scope to instances of personal injury. As suggested by the discussion at page 20 supra concerning the breadth of the indemnification provision, the Court rejects this construction of the contract language, finding no basis for limiting the broad scope of the clause's second sentence to the personal injury context plainly stated in the first sentence. The Court likewise is unpersuaded by Tall Stacks' assertion that the third sentence of § III(F) constitutes a mutual indemnity clause which "cancels out" Tall Stacks' obligations under the second sentence. The third sentence provides that MLI shall indemnify Tall Stacks for loss "imposed upon or incurred by [Tall Stacks] as a result of any act of omission or commission by [MLI], its agents or employees...." The narrower scope of this indemnification provision would, if at all, cancel only Tall Stacks' obligation to MLI with respect to losses of the limited nature indicated, and would not affect Tall Stacks' indemnification of losses by MLI not resulting from MLI's own conduct.

Tall Stacks' final defenses, invoking doctrines of waiver and estoppel, are that MLI may not recover against Tall Stacks because the $250,000 hull policy purchased by Tall Stacks constitutes the limitation of Tall Stacks' obligation to indemnify MLI and because Tall Stacks is a co-insured with MLI under the policy. To limit Tall Stacks' obligation to the policy limits would in the Court's view render meaningless, or at the very least conflict with, the indemnification clause. As to both arguments, the Court is not persuaded that the legal bases are correct or, in any event, have application to the facts of this case. The cases upon which Tall Stacks relies in support of these contentions, see pp. 9–10 of Tall Stacks' Post–Trial Brief, are each distinguishable from the instant case. These defenses are therefore rejected.

As a practical matter, however, the Court having found for Tall Stacks on other grounds, the $250,000 proceeds of the hull policy which have been paid out to the benefit of MLI constitute the limit of Tall Stacks' liability concerning the sinking of the Ste. Genevieve. Based on its conclusion that

---

3. The Court will not address at all Tall Stacks' contentions concerning constructive total loss, betterment, set-off and mitigation, all of which relate to MLI's claimed damages.

MLI breached an implied warranty of seaworthiness and thereby voided Tall Stacks' obligations under the indemnification provision of the parties' contract, the Court will enter judgment in favor of Tall Stacks on MLI's third-party complaint.

*MDD's Claims v. MLI*

The Court next turns to the claims of MDD. The Court's disposition of MLI's third-party claim has answered the question as to who ultimately bears responsibility for MDD's charges. MLI having conceded that there is no issue as to *whether* MDD is owed, the sole question remaining is *how much* MDD is owed for repair, dry dock and fleeting charges. The Court concludes generally that MDD's course of action was reasonable and consistent with a measured approach to the rights of the vessel owner, the demands of MDD's own business, and the requirements of the Coast Guard's Captain of the Port order.

The Court finds owing the total of $25,-967.54 for labor, materials and sales tax as the cost of repairs to the hull which were made to meet the Coast Guard's requirements for removal of the Ste. Genevieve from dry dock. MLI has offered no substantial challenge to this amount, and the Court deems it to be fair, reasonable and necessary, as well as a good-faith mitigation of MDD's overall damages, in that it allowed the curtailment of daily dry dock fees.

■ In addition, MDD seeks dry dock fees of $2,500 per day for the period from December 4, 1992 through January 19, 1993. The Court will award dry dock fees at the requested rate. That rate was set forth in MDD's initial quotation to MLI, which was signed by Richard Wooten as MLI's president. At trial, MDD's expert testimony as to the reasonableness of the charge was not rebutted by MLI. Evidence at trial concerning the potential daily income to MDD for use of the larger dry dock also supports the requested charge. The Court rejects as unreasonable, however, MDD's claim for dry dock fees for the period from January 8 through 19, 1992, during which time MDD was making repairs to the Ste. Genevieve as necessary to remove her from dry dock. MDD's president, Mr. Erlbacher, testified that dry docking charges are not customarily imposed during the period of time in which repair work is being performed on a vessel in dry dock. Although Mr. Erlbacher further testified that in the past two years, MDD had not charged any other customer a per diem charge, he also indicated that MDD had had no other customers who docked a vessel but did not give authorization for repairs within two weeks' time. Based on this testimony, the Court will award MDD dry dock fees only for the period of December 4, 1992 through January 7, 1993. At $2,500 per day for 35 days, the Court's calculation yields a total of $87,500 in dry dock charges.

■ With respect both to dry dock and fleeting charges, the Court rejects MLI's contention that the charges owing should be calculated only on the basis of a six-day week, on the ground that MDD's work week ordinarily consisted only of six days. The provision of a dry dock or fleeting berth was made to the Ste. Genevieve for seven days each week; furthermore, MDD's quotation letter indicates no basis for the limitation urged, referring as it does to "Lay Day" charges for "each 24 hour period of indecision" with the vessel in dry dock and to fleeting charges assessed "per calendar day."

MDD seeks fleeting fees at the rate of $100 per day from January 20, 1993 through the present. As with the dry dock charges, this rate was set forth in MDD's November 9, 1992 quotation letter, to which Richard Wooten indicated his assent by his signature dated the same day, and MDD's expert testimony concerning the reasonableness of the charge was not challenged at trial. At the rate of $100 per day, the fleeting charges through the date of the entry of judgment total $65,200.00 for 652 days. The Court notes, however, as does MDD itself, a distinction between MDD's recovery of dry dock charges and its recovery of fleeting charges. Although they might have been, fleeting charges were not pled by MDD in its complaint as an item of damage; Count I of the complaint seeks recovery for dry dock charges and Count II for repairs. Instead, MDD seeks fleeting charges as expenses *custodia legis, i.e.*, as expenses reasonably in-

curred in its role as substitute custodian of the Ste. Genevieve while under arrest pursuant to the seizure warrant pending the outcome of this action.

 Under the common law of admiralty, MDD is entitled to pre-judgment interest on its claims against MLI: "[p]rejudgment interest is awarded in admiralty suits in the discretion of the district court to ensure compensation of the injured party in full and should be granted unless there are exceptional or peculiar circumstances." *Ohio River Co. v. Peavey Co.*, 731 F.2d 547, 549 (8th Cir.1984). *See also SCNO Barge Lines, Inc. v. Sun Transportation Co., Inc.*, 775 F.2d 221, 227–28 (8th Cir.1985). The Court finds that the rate of 6% per annum compounded annually, as urged by MDD and not objected to by MLI, approximates the average prime interest rate for the period since MDD's claims accrued and is reasonable and in accordance with pertinent case law. *See, e.g., Ohio River*, 731 F.2d at 549; *Federal Barge Lines, Inc. v. Granite City Steel*, 664 F.Supp. 453, 454 (E.D.Mo.1987).

Based on the distinction noted above between the awards of repairs and dry dock charges on the one hand, and fleeting charges on the other, the Court does not deem prejudgment interest appropriate as to the fleeting charges. This conclusion is also based on the "running" nature of the per diem fleeting charges, which have continued to accrue through the date of the entry of judgment herein. The Court will calculate prejudgment interest as having begun to accrue on the dry dock charges as of January 8, 1993, the day following the Ste. Genevieve's removal from dry dock, and as having begun to accrue on the repair charges as of January 20, 1993, the day following the completion of the repairs.

MDD has not demonstrated, and the Court is not aware of, any legal basis for the imposition of attorney's fees against MLI. Based on the foregoing, the Court will enter judgment in favor of MDD and against MLI and the Ste. Genevieve *in rem* in the total amount of $191,332.92, consisting of $25,967.54 for repairs, $87,500 in dry dock charges, $65,200.00 in fleeting charges, and $12,665.38 in prejudgment interest, plus costs and such post-judgment interest as is allowed by law.

For the reasons stated above,

**IT IS HEREBY ORDERED** that third-party defendant Greater Cincinnati Tall Stacks Commission's motion for leave to amend its answer to conform to the evidence is granted.